

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| NEIL T. LARSON, | 4:14-CV-04157-RAL |
|---|---|
| Plaintiff, | |
| | OPINION AND ORDER AFFIRMING IN |
| vs. | PART BUT VACATING AND |
| | REMANDING THE COMMISSIONER'S |
| CAROLYN W. COLVIN, ACTING | DECISION |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Neil T. Larson ("Larson") seeks reversal of the Commissioner of Social

Security's decision denying Larson disability insurance benefits and supplemental security

income (collectively "social security benefits"). For the reasons explained below, this Court

affirms in part the Commissioner's decision, but vacates and remands the decision for further

consideration.

## I. Background

### A. Procedural Background

Larson last worked on August 15, 2007, which he contends to be the onset date of his

claimed disability. AR 225, 232.[1] In 2009, Larson filed claims for social security benefits,

which were denied in 2010 after an administrative hearing before an administrative law judge

("ALJ"). AR 65–75. There is limited information in the appeal record before this Court

---

[1] The appeal record before this Court will be cited as "AR" followed by the page or page
numbers.

1

concerning that prior case, although the Notice of Decision-Unfavorable and the decision of the ALJ from 2010 are part of the record. AR 65–75. Larson did not appeal from that 2010 denial of social security benefits.

On May 25, 2011, Larson protectively filed an application for supplemental security benefits and an application for disability insurance benefits. AR 225–38. Larson's filings did not seek reconsideration of the prior ALJ decision, but involved resubmission of information and apparently different or at least additional records. The Commissioner denied Larson's claims initially on July 26, 2011. AR 125–27. Larson requested reconsideration, AR 128–31, and the claims were denied upon reconsideration on March 12, 2012. AR 102–24. Larson then sought a hearing before an ALJ, which was conducted on March 20, 2013. AR 34, 37–64. In April of 2013, the ALJ issued his decision denying Larson's claims for social security benefits. AR 7–21.

Larson then hired a new attorney, AR 32–33, who appealed to the appeals council and submitted new material, AR 314–18, 553–72. The new material included old medical records from prior hospitalizations and a recent evaluation of Larson by neuropsychologist James A. Dickerson. AR 313–18, 508–72. The extensive neuropsychological evaluation directly undercut the ALJ's foundation for denying social security benefits to Larson and raised other issues about potentially severe cognitive and psychological impairments impacting Larson's ability to work. See AR 553–72. The appeals council purportedly considered this new information in stating, "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." AR 1; see also AR 4 (listing Dickerson report and additional material concerning Larson's hospitalizations for acute pancreatitis). Without any further explanation, the appeals council then included its stock

2

language: "We found that this information does not provide a basis for changing the Administrative Law Judge's decision." AR 2. In considering the record as a whole, this Court disagrees that Dr. Dickerson's report can be so casually dismissed with regard to determining Larson's residual functional capacity ("RFC") and ability to perform a light-duty job, such that remand on those issues is proper. This Court, however, affirms the ALJ's decisions on certain other matters challenged by Larson.

## B. Factual Background

Larson was born in May of 1970. AR 39, 225. He has no children and has never been married. AR 51–52, 232–33. Since 2011, Larson has lived in a subsidized housing unit and has been supporting himself through moneys his parents give him and welfare programs, including Supplemental Nutrition Assistance Program benefits. AR 51, 226–231. Larson is adopted and was raised in Beresford. AR 269, 556. He dropped out of high school toward the end of his senior year and ultimately received a GED. AR 39. He attended vocational school in Mitchell for architectural drafting and building construction for one year. AR 39. His work history primarily has been in the food service industry, although he worked during 1999 and 2000 doing painting for a commercial grain dryer business where he had to lift up to 70 pounds. AR 39–40. Thereafter his employment was in making sandwiches or pizzas and in delivering pizzas. AR 39–40, 243–92. He last worked in August of 2007 delivering pizzas, but was fired from that job reportedly for taking too long to complete the work. AR 40–41. Larson testified that his diabetes and other problems caused him to become tired and fatigued, such that by August of 2007 he could no longer perform the duties of that job. AR 41–42.

Larson's medical history is significant for two critical bouts with acute pancreatitis. Larson was hospitalized in June and July of 2002 for treatment of severe pancreatitis. AR

3

508–29. After his discharge, Larson resumed work. AR 277–81. However, Larson apparently stopped taking medication to treat his pancreatic issues and became critically ill in late December of 2004. AR 531–32. Larson was hospitalized from December 30, 2004, until January 28, 2005, with a life-threatening bout of acute pancreatitis. AR 531–52. Larson at one point was subject to a do-not-resuscitate order during part of that one month of hospitalization. AR 532. However, Larson was able to engage in substantial gainful employment for most of the next two years after his discharge from this second hospitalization. AR 277.

The record is devoid of documentation as to Larson's health around the alleged date of the onset of disability—August 15, 2007. Besides the hospitalizations for acute pancreatitis, the earliest medical records in the appeal record before this Court are from 2009. Larson typically sought medical care from Falls Community Health, which provides health care for low income or indigent individuals. AR 43. By 2009, Larson had poorly-controlled diabetes and issues with his knees and back. AR 358–59. The records from 2010 from Falls Community Health characterize Larson as having diabetes, poorly controlled; low back pain with pain radiating down the right leg at times; and obesity. AR 345–58. A record from January of 2010 mentions the possible need for Larson to undergo a psychiatric examination. AR 356. However, the records from 2010 do not support a conclusion of cardiovascular problems at that time. See AR 356 ("No cardiovascular symptoms"); AR 352 (noting heart rate, rhythm, and sounds as normal).

Larson's medical records from 2011 reflect poorly-controlled diabetes, as well as high cholesterol. AR 338–41, 362. In March of 2011, Larson reported feeling fairly well, but having trouble sleeping. AR 341. Those records characterize Larson as being resistant to any changes suggested on how he might better regulate his diabetes and address other health issues. AR 341.

4

In late April of 2011, Larson went to Sanford USD Medical Center for chest pain and shortness of breath. AR 320. Although his blood sugar was within the range of normalcy, Larson felt dizzy and had an elevated heart rate. AR 326. Larson's symptoms resolved, and he was discharged to go home. AR 330. Subsequent records from Falls Community Health reflect that his chest pain was resolved, but that he was continuing to have low back pain as well as left shoulder pain from sleeping on it wrong. AR 338.

In June of 2011, Larson visited Falls Community Health, where his blood sugar range was reported to be very high at times, and where his trouble sleeping was noted. AR 368. According to the records, his "[b]ack [is] feeling better but he continues to have some bad days, but the good days are more frequent than before." AR 368. In the summer of 2011, Larson was on a series of medications, including Crestor,[2] Actos,[3] TriCor,[4] Flonase,[5] Hydrochlorothiazide-Lisinopril,[6] Singulair,[7] Cozaar,[8] as well regular insulin for control of his ongoing diabetes. AR 333.

---

[2]Crestor "is used together with a proper diet to lower cholesterol and triglycerides (fats) in the blood." Rosuvastatin (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/rosuvastatin-oral-route/description/drg-20065889 (last updated Jan. 1, 2016). Crestor may help slow or prevent medical problems including hardening of the arteries and certain blood vessel and heart problems. Id.

[3]Actos helps control blood sugar levels and is taken by patients to help treat type 2 diabetes. Pioglitazone (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/pioglitazone-oral-route/description/drg-20065503 (last updated Dec. 1, 2015).

[4]TriCor is used by patients to treat high cholesterol and triglyceride levels. Fenofibrate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/fenofibrate-oral-route/description/drg-20068427 (last updated Nov. 1, 2015). TriCor "may help prevent the development of pancreatitis . . . caused by high levels of triglycerides in the blood." Id.

[5]Flonase is a nasal corticosteroid that is used to treat "stuffy nose, irritation, and discomfort of hay fever, other allergies, and other nasal problems." Corticosteriod (Nasal Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/corticosteroid-nasal-route/description/drg-20070513 (last updated Nov. 1, 2015).

[6]Hydrochlorothiazide-Lisinopril is a combination drug that treats high blood pressure. Lisinopril And Hydrochlorothiazide (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/lisinopril-and-hydrochlorothiazide-oral-route/description/drg-20069073 (last

5

On July 23, 2011, non-examining physician Kevin Whittle issued two separate but very similar Disability Determination Explanations. AR 81–100. Dr. Whittle received certain listed medical records through June of 2011. AR 83–84, 93–94. Dr. Whittle determined that Larson had severe impairments of diabetes mellitus, spine disorders, and sleep-related breathing disorders, but that Larson appeared to overstate his limitations. AR 86, 96. Dr. Whittle assessed Larson's functional limitations and noted Larson could: occasionally lift or carry twenty pounds, frequently lift and carry ten pounds, sit for six hours in an eight-hour workday, frequently climb stairs and ladders, and frequently stoop, bend, or crouch. AR 86–87, 96–97. Dr. Whittle concluded and opined that Larson did not have the ability to perform past relevant work, but had the RFC to perform light work and thus was not disabled. AR 89, 99.

Larson twice more in 2011 received emergency room care for chest pain. On August 14, 2011, Larson presented to Sanford USD Medical Center because of having a headache, dizziness, and chest discomfort. AR 393. His symptoms resolved, and a cardiac referral simply confirmed the previously diagnosed diabetes, hypertension, and dyslipidemia. AR 393–95. Larson presented again to the emergency room on October 9, 2011, with chest pain. AR 377.

---

updated Dec. 1, 2015). "Lisinopril is an angiotensin converting enzyme . . . inhibitor" that blocks the substance which causes blood vessels to constrict. Id. "Hydrochlorothiazide is a thiazide diuretic (water pill) . . . [that] reduces the amount of water in the body by increasing the flow of urine which helps lower the blood pressure." Id.

[7]Singulair treats and prevents asthma by decreasing the "symptoms and the number of acute asthma attacks." Montelukast (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/montelukast-oral-route/description/drg-20064902 (last updated Dec. 1, 2015). Singulair is also "used to prevent exercise-induced bronchoconstriction (EIB), and treat symptoms of seasonal (short-term) or perennial (long-term) allergies, such as sneezing, runny nose, itching, or wheezing." Id.

[8]Cozaar "is an angiotensin II receptor blocker" which is used to treat high blood pressure and "may reduce the risk of strokes and heart attacks." Losartan (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/losartan-oral-route/description/drg-20067341 (last updated Jan. 1, 2016). Patients with type 2 diabetes who have had a history of high blood pressure may also take Cozaar to treat kidney problems. Id.

6

Larson underwent a stress test, where there were no significant abnormal findings, and Larson himself expressed the view that personal stress likely caused his temporary chest pain. AR 377. Larson reportedly seemed depressed, but would not share what psychological stressors he felt. AR 377–78.

On February 27, 2012, psychologist Shelley Sandbulte at Family Services, Inc., completed a report for South Dakota Disability Determination Services regarding her assessment of Larson. AR 397–404. Larson was cooperative, direct, and forthright during Sandbulte's interview of him. AR 397. Larson denied any past psychiatric or psychological issues. AR 397. Larson talked of having been teased and bullied through life. AR 398. Larson reported having a neck and back injury from a 1994 motor vehicle accident and described his two serious bouts of pancreatitis. AR 398. Larson also spoke of his recent emergency room visits and mentioned feeling sleep deprived. AR 398. Larson described his educational background and his work history, including being fired from his final job in 2007 because, in his assessment, his unstable blood sugars affected his work performance. AR 399–400. Larson talked of a somewhat lonely existence, having two friends and socializing mostly in the community room of his apartment complex. AR 400. Larson described himself as somewhat depressed and complained of low back pain and right hip pain, causing him to spend much of his time lying on a floor. AR 401. Sandbulte did not observe Larson shifting in his chair or moving about during the interview, however. AR 401. Larson performed normally on some simple cognitive tests administered by Sandbulte. AR 402–04. Larson acknowledged that he can drive and shop and that his parents pay for much of his bills. AR 402.

Sandbulte's diagnostic impression of Larson included possible dysthymia; dependent personality disorder with possible self-centeredness and a sense of entitlement; physical

complications of diabetes, obesity, low back pain, leg pain, COPD, sleep apnea, and varicose veins by self-report; and psychological stressors. AR 402. Sandbulte was unsure if Larson's depression was due to declining health or a product of his lack of motivation in being proactive about his own health and independence. AR 403. Sandbulte ultimately opined "that there are no psychiatric or psychological issues that would interfere in [Larson's] ability to be employed and/or negatively impact his activities of daily living." AR 404. Sandbulte concluded that the issue of disability, in her view, turned on the effect of his physical issues, including diabetes and obesity. AR 404.

In April of 2012, Larson reported to Sanford USD Medical Center with symptoms of shaking, possibly from elevated blood sugar. AR 406. The symptoms resolved and he was sent home. AR 405–13.

On October 19, 2012, Larson presented to Sanford USD Medical Center with nausea and lightheadedness. AR 415. His blood sugar reading was 292 at that time, his weight was recorded as 290 pounds, and he had chronic low back pain. AR 415–16. Larson was hospitalized until October 21, 2012, with diabetic ketoacidosis. Doc. 415–45. He was discharged with instructions to keep his blood sugar in good control through medication, diet, and exercise. AR 424. During the hospitalization, he underwent an assessment for sleep-related desaturation, with the finding of possible desaturation in early morning hours. AR 444.

On November 27, 2012, Larson was seen at Heuermann Counseling Clinic, which provides mental health care to low and no income individuals in Sioux Falls, for anxiety related to his upcoming disability hearing. AR 449.

Larson was hospitalized from December 28 until December 31, 2012, at Sanford USD Medical Center due to reported chest pain. AR 450. Larson underwent a series of tests as a

8

result. AR 450–60. A venous duplex study was largely normal, but recorded evidence of superficial venous insufficiency of his right lower extremity. AR 460. There was no evidence of deep venous thrombosis or superficial thrombophlebitis of either the right or left lower extremity. AR 460. Larson's discharge summary stated that "he has multiple excuses as to why he cannot change his diet or exercise, most related to money and agoraphobia."[9] AR 465. The discharge summary also noted that his diabetes was poorly controlled and that he was on the maximum dosing of Crestor and Tricor for triglycerides. AR 466. The findings of Larson's nuclear stress test were described as containing a "small defect, with intensity that is mildly reduced." AR 467.

The appeal record contains few medical records concerning Larson's treatment after 2012. Larson visited Falls Community Health on January 14, 2013, with a chief complaint of low back pain ongoing for a couple of years. AR 462. Larson described that chiropractic treatment helped him for only a day and that he had no money for an MRI. AR 462. Larson complained of pain radiating down both legs. AR 462. Larson also mentioned that he had been in the hospital for a cardiology workup, the results of which were good. AR 462.

The administrative hearing before the ALJ then occurred on March 20, 2013. AR 37. At the administrative hearing, Larson testified about his education and work, as detailed above. AR 38–56. Larson described his physical issues and treatment, focusing on diabetes, varicose veins in his right leg, low back pain, leg weakness, dizziness due to high blood sugars, and high blood pressure. AR 42–46. Larson spoke of having trouble sleeping due to his discomfort, sleeping on a mat on his floor, limits to his sitting to a two-hour period and no more than four hours in a day, trouble standing for more than three hours in a day and no more than half an hour at a time, and

---

[9]Agoraphobia is "a fear of being in open or public spaces." Agoraphobia, Merriam-Webster, http://www.merriam-webster.com/dictionary/agoraphobia (last visited Feb. 23, 2016).

9

ability to walk for forty-five minutes to an hour at a time and no more than two hours in a day. AR 48–50. Larson said that he could lift up to sixty pounds when his back was not bothering him. AR 51. Larson lived alone and his activities primarily include watching television, listening to the radio, surfing the internet, and laying around. AR 46–47, 52. Larson testified that he makes his own meals, has his own car, and walks his apartment building for exercise. AR 52. In answers to questions by the ALJ, Larson acknowledged that his primary care physician had not placed limitations on him and that his mental health issue was anxiety. AR 54. Larson described himself as being a bit less healthy at the time of the 2013 hearing than he had been in 2010, during the prior hearing with the ALJ. AR 55–56.

The ALJ at the administrative hearing then called vocational expert James Miller as a witness. AR 56. Miller initially testified that Larson's past job as a pizza delivery person would fit his limitations, but that his other past work would not. AR 58. Miller saw no reduction in Larson's ability to do a full range of unskilled light work and singled out the unskilled job of a mail clerk as being one that Larson could perform. AR 59–60. On cross-examination by Larson's counsel, Miller conceded that the limitations that Larson described in his testimony would render him incapable of returning to the pizza delivery job. AR 61–62.

### C. ALJ Ruling and Appeals Council Consideration

The ALJ issued his decision in April 2, 2013, denying Larson's applications for benefits. AR 10–21. The ALJ concluded that Larson met the insured status requirement of the Social Security Act through December 31, 2012. AR 12. The ALJ appropriately analyzed Larson's claim under the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under "the familiar five-step process" to determine whether an individual is disabled, Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010), "[t]he ALJ 'consider[s]

10

whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment is, or was comparable to, a listed impairment; (4) she could perform past relevant work; and, if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (second alteration in original) (quoting Halverson, 600 F.3d at 929); see also 20 C.F.R. § 416.920 (detailing the five-step process used in evaluation claims).

At the first step, the ALJ determined that Larson had not engaged in substantial gainful activity since the alleged onset date of the claimed disability, August 15, 2007. AR 12. At step two, the ALJ found that Larson suffered from the following severe impairments: diabetes mellitus, obesity, degenerative disc disease, and a sleep disorder. AR 12. The ALJ chose not to consider hypertension or cardiovascular issues to be a severe impairment because Larson's hypertension could be controlled by medication and his cardiovascular workup and history indicated his issues to be non-severe. AR 13. The ALJ considered Larson's mental health impairments to be minimal limitations. AR 13. At step three, the ALJ determined that Larson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. AR 14–15. In reaching this conclusion, the ALJ considered degenerative disc disease, diabetes, and obesity from among the listings. AR 15.

At step four, the ALJ determined that Larson was unable to perform any past relevant work. AR 19. In doing so, the ALJ appeared to credit Larson's testimony of his limitations and depart from Miller's initial testimony that Larson could do light-duty work generally including his past work as a pizza maker and delivery man. See AR 19, 58–60. Rather, the ALJ appeared to accept the position of Larson's counsel in cross-examination of Miller, where Miller acknowledged that Larson's description of his limitations would render him unable to return to his pizza delivery job. See AR 61–62. Nevertheless, under the step-five analysis of whether

11

Larson could perform any other work, the ALJ concluded that Larson had the RFC to perform light-duty work. AR 15–19. In reaching that conclusion, the ALJ drew from the assessment done by Dr. Whittle in July of 2011. AR 18–19; see AR 81–100. In concluding that jobs existed in significant numbers in the national economy that Larson could perform, the ALJ relied on the vocational expert's opinion that Larson could work as a "mail clerk." AR 20 (emphasis omitted). The ALJ therefore concluded that Larson was not disabled. AR 20–21.

After the ALJ's decision, Larson retained new counsel, who in turn requested that neuropsychologist James A. Dickerson evaluate Larson. AR 32–33, 553–66. On October 27, 2013, Dr. Dickerson undertook a neuropsychological evaluation of Larson. AR 553. Dickerson reviewed medical records, including Larson's hospitalizations in 2002 and in late 2004 and early 2005 for acute pancreatitis. AR 552–54. During that second hospitalization, Larson had been on mechanical ventilation and very critically ill. AR 531–32, 553–54. Dr. Dickerson interviewed Larson's adoptive parents, who described him as not seeming to "get it," having difficulty planning his time, struggling to finish tasks, not learning from experience, having difficulty communicating, having unusual sleep patterns, and shopping at night to avoid any crowds. AR 554–55. Larson's adoptive parents also described circumstances of his birth and upbringing. AR 556. Dr. Dickerson interviewed Larson and found him to be able to communicate well. AR 557. Dr. Dickerson deemed Larson to have a panic disorder and agoraphobia, illustrated by his propensity to shop in the wee morning hours to avoid crowds. AR 558. Larson scored generally well on intelligence testing and had a full scale IQ of 95. AR 559–60. However, Larson scored very poorly on certain tests, including tests of processing speed and his verbal learning abilities. AR 560. Larson passed a series of tests and demonstrated himself to be a good visual learner, AR 561–62, but did not pass other tests, AR 563. Dr. Dickerson believed Larson to have

dementia due to organ failure and encephalopathy, panic disorder with agoraphobia, and dysthymia. AR 563. Dr. Dickerson then explained that survivors of critical illness can suffer prolonged and disabling cognitive impairments with lasting cognitive effects. AR 564. Dr. Dickerson ultimately opined that his neuropsychological testing revealed that "Mr. Larson could not specifically perform the 209.687-026 Mail Clerk Job." AR 570. Dr. Dickerson reasoned that Larson lacked the cognitive abilities and dexterity to do such work. AR 570. Dr. Dickerson's opinion thus directly undercut the ALJ's conclusion that Larson could work as a mail clerk.

The appeals council had before it information that the ALJ did not—specifically, records from Larson's hospitalizations for acute pancreatitis and Dr. Dickerson's report. AR 4. The appeals council purported to take these matters into consideration by noting, "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." AR 1, 4. Without any further explanation, the appeals council stated: "We found that this information does not provide a basis for changing the Administrative Law Judge's decision." AR 2. Basically, the appeals council decision is the stock form for denying review that this Court has previously and repeatedly seen from the appeals council.

## II.    Standard of Review and Preliminary Issues

### A. "Substantial Evidence in the Record as a Whole" Standard

When considering whether the Commissioner properly denied social security benefits, a court must "determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)); see also

Nowling v. Colvin, No. 14-2170, slip op. at 12–13 (8th Cir. Feb. 22, 2016). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," id. (internal citations omitted), and such errors are reviewed de novo, id. (quoting Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008)).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994); see Nowling, slip op. at 12–13; Chaney v. Colvin, No. 14-3433, slip op. at 4 (8th Cir. Feb. 3, 2016). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also Nowling, slip op. at 13. It is that which "a reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, No. 14-1639, slip op. at 6 (8th Cir. Apr. 27, 2015) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord Nowling, slip op. at 13; Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). "[T]he 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard[.]" Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted.).

A reviewing court therefore must "consider evidence that supports the [Commissioner's] decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995); see also Nowling, slip op. at 13. In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th

Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subject testimony, are primarily for the [Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision of the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992); see also Chaney, slip op. at 4 (quoting Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003)). The court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." Miller, slip op. at 6 (quoting Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014)); see also Nowling, slip op. at 13.

## B. Effect of Prior Decision

Larson's previous application for social security benefits was denied in 2010 and not appealed. AR 65–75. The Commissioner and Larson debate the effect of res judicata as it relates to Larson's previous application and denial of benefits. Doc. 16 at 2; Doc. 17 at 2–4.

The United States Court of Appeals for the Eighth Circuit has explained that "[r]es judicata bars subsequent applications for [social security benefits] based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled. If res judicata applies, the medical evidence from the initial proceeding cannot be subsequently reevaluated." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 364–365 (8th Cir. 2007) (internal citations and quotations omitted). In this case, however, Larson does not attempt to reopen the ALJ's 2010 decision denying benefits. Instead, Larson is claiming that additional medical evidence, when considered alongside some of the medical evidence before the ALJ in 2010,

15

establishes that he had multiple severe impairments during the time period relevant to the case and is entitled to social security benefits. Medical evidence that predates a claimant's alleged onset of disability date is not categorically irrelevant to a finding of a severe impairment. See Groves v. Apfel, 148 F.3d 809, 810–11 (7th Cir. 1998) ("There thus is no absolute bar to the admission in the second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits. The 'readmission' of that evidence is barred only if the finding entitled to collateral estoppel effect establishes that the evidence provides no support for the current claim."); see also Hanneman v. Astrue, 11-CIV-4113-RAL, 2012 WL 1812424, at 9 (D.S.D. May 17, 2012); Smith v. Astrue, 09-CV-3065-DEO, 2011 WL 1230327, at *3 n.8 (N.D. Iowa Mar. 30, 2011).

The prior decision of the Commissioner, from which Larson did not appeal, may foreclose considering the disability onset date to have been in August of 2007, but does not foreclose consideration of whether Larson is entitled to social security benefits at this time because he became disabled thereafter. Larson, of course, must show that he was insured under the Social Security Act when he became disabled to get disability insurance benefits. Hinchey v. Shalala, 29 F.3d 428, 431 (8th Cir. 1994). However, as the ALJ found, Larson met the insured status requirements under the Social Security Act through December 31, 2012. AR 10. Thus, the prior, final decision from 2010 on Larson's entitlement to social security benefits in 2010 does not foreclose the possibility of his being entitled to such benefits under his present claim. Moreover, the Commissioner did not assert res judicata as an affirmative defense or basis for denial of Larson's claims. Doc. 11; see also Marcus v. Sullivan, 926 F.2d 604, 615–16 (7th Cir. 1991) (a commissioner can waive res judicata through failing to raise it as an affirmative defense in its answer).

16

## C. Effect of Submission of New Evidence to Appeals Council

Another preliminary issue important to this case is the effect of the submission of new evidence by Larson between the time of the ALJ decision and the appeals council affirmance. Where, as in Larson's case, the appeals council considers new evidence but denies review, a district court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007). The Eighth Circuit explained in Cunningham v. Apfel why this is the case:

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. See 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. See Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. See 20 C.F.R. § 404.970(b). Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination. See Nelson, 966 F.3d at 366.

222 F.3d 496, 500 (8th Cir. 2000); see also Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

Thus, this Court is not to decide whether the appeals council erred in denying review, but to evaluate whether the records unavailable to the ALJ of the two hospitalizations for serious pancreatitis and the subsequent neuropsychological evaluation are of such impact to prevent the conclusion that substantial evidence in the record as a whole supports the ALJ's decision. In short, this Court is left with the "peculiar task" of deciding "how the ALJ would have weighed the new evidence had it existed at the initial hearing." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000) (citation omitted). "Critically, however, this Court may not reverse the decision of the ALJ merely because substantial evidence may allow for a contrary decision." Id.

## III. Discussion of Issues Raised

Larson raises four issues with the ALJ's decision: 1) whether the ALJ failed to identify certain severe impairments at step two of the sequential evaluation; 2) whether the ALJ correctly determined that Larson's impairments did not meet or equal a listed level impairment; 3) whether the ALJ properly assessed RFC; and 4) whether the ALJ's findings in step five comported with legal standards and substantial evidence in the record as a whole. Doc. 15 at 29. This decision addresses each of these issues separately.

### A. ALJ's Assessment of Severe Impairments at Step Two

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments is "severe." 20 C.F.R. §§ 404.1520(c), 416.921. An impairment or combinations of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. Id. §§ 404.1520(c), 416.921 An impairment or combination of impairments is "not severe" when medical or other evidence establishes only a slight abnormality having no more than a minimal effect on an individual's ability to work. Id. §§ 404.1521, 416.921.

The claimant has the burden to establish that her impairments or combination of impairments are severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Id. at 708 (internal citation omitted). An impairment is "severe" if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities means "the abilities and aptitudes necessary to do most jobs." Id. § 404.1521(b). These abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling reaching, carrying, or handling;" "[c]apacities for

18

seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[using] judgement;" "responding appropriately to supervision, coworkers, and usual work situation; and" "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b)(1)–(6). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

The ALJ concluded that Larson's diabetes mellitus, obesity, degenerative disc disease, and sleep disorders were severe impairments. Larson takes issue with the ALJ not including cardiovascular issues and possible small vessel or peripheral vascular disease being severe impairments for Larson.[10] Mindful of the "substantial evidence in the record as a whole" standard, this Court cannot conclude that the ALJ erred at step two by failing to include those particular conditions among the severe impairments found. There is substantial evidence in the medical records to conclude that Larson did not have a severe impairment on account of cardiovascular issues or small vessel or peripheral vascular disease.

Larson had been to an emergency room on several occasions for feelings of chest pain, but typically was released because the chest pain subsided. The chest pain prompting those emergency room visits seemed to be caused by stress or abnormal blood sugars, and the medical records do not connect the hospitalizations to a "severe" impairment of cardiovascular disease. See AR 319–32, 372–96, 405–15. While Larson was at Sanford USD Medical Center in

---

[10]Larson did not challenge the ALJ's determination that Larson's mental health impairments were minimal limitations, so this Court does not address that issue.

December of 2012, he underwent testing to evaluate the possible cause of periodic chest pain. The test results described only a "small defect," with the only irregular finding being "evidence of superficial venous insufficiency of the right lower extremity." AR 460, 467. Although Larson had multiple risk factors—diabetes, obesity, hypertension, and high cholesterol—Larson remained resistant to change of his diet or lifestyle. AR 465. Although Larson may experience future cardiovascular problems due to these risk factors, there is no indication in the workup from Sanford USD Medical Center or elsewhere in the record that he had any "severe" cardiovascular or vascular problems. AR 450–60, 464–507.

## B. Step Three Issue—Equivalence to Listing-Level Impairment

Larson argues that the ALJ should have deemed Larson to have the equivalent of listing 1.04 "degenerative disc disease" or should have better developed the record to evaluate that equivalency. Doc. 15 at 33. Larson also argues that his cardiovascular findings not only should have been considered a severe impairment, but also should have qualified under listing 4.00 for cardiovascular disease. Doc. 15 at 33–37.

The listing of impairments describes impairments for each of the major body systems that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). At step three, the ALJ must determine whether a claimant's impairments, when taken individually and in combination, meet or are medically equal to a listed impairment. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). When a claimant has "a combination of impairments, no one of which meets a listing . . . , [the ALJ] will compare [the claimant's] findings with those for closely analogous listed impairments." 20 C.F.R. § 404.1526(b)(3). To be medically equivalent, the combination of impairments must be "at least equal in severity and

20

duration to the criteria in any listed impairment." Id. § 404.1526(a). "Medical equivalence must be supported by medical findings; symptoms alone are insufficient." Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008). The claimant bears the burden of establishing that her impairments equal a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

Larson has not shown that he met listing 1.04 pertaining to disorders of the spine, including degenerative disc disease. This listing requires a showing of degenerative disc disease "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord . . . [with] . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising tests (sitting and supine)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04A. To meet the listing in 1.04C, Larson must have nonradicular pain and weakness, which results in an inability to ambulate effectively, as defined in 1.00B2. That section in turn defines the inability to ambulate effectively as an extreme limitation if the claimant cannot walk without a walker, two crutches, or two canes. Larson did not meet listing 1.04A or 1.04C or any equivalence thereof. Larson had normal neurologic examinations with normal sensation, reflexes, and motor function, including normal gait in 2010 (AR 346, 348, 352, 357), 2011 (AR 328, 371, 394–95) and 2012 (AR 406–07, 415–16, 432, 462–63). Medical notes from Larson's January of 2013 examination show motor and sensory examinations with no dysfunction in reflexes. AR 463. Thus the ALJ had substantial evidence in the record as a whole to find that Larson did not meet the listed impairment for degenerative disc disease or an equivalency thereof.

There are multiple reasons why Larson's condition does not satisfy listing 4.04B or 4.04C regarding cardiovascular issues. Larson did not meet the listings capsule requirements, which require the presence of myocardial ischemia despite compliance with a prescribed treatment regimen. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.04. Larson did not have any particular cardiac treatment regimen though he had received instruction about lifestyle changes to better control his diabetes, weight, and overall health. Nor did Larson have three separate ischemic episodes due to myocardial ischemia within a twelve-month period as required to satisfy listing 4.04B. See id. pt. 404, subpt. P, app. 1, § 4.04B. There is no evidence that Larson had myocardial ischemia, which requires evidence that his "heart muscle is not getting as much oxygen as it needs." Id. pt. 404, subpt. P, app. 1, § 4.00C.1.b. As explained above, several of Larson's visits to the emergency room for chest pain did not result in a conclusion of a cardiovascular problem at all, but were attributed to stress, poorly controlled blood sugars, or other causes. When Larson had a cardiology workup, the conclusion was "[n]o stenting was necessary," AR 467, and that the findings were minimal. Thus, Larson cannot meet the requirements of 4.04B or any equivalency thereof. Larson also cannot meet the last requirement of listing 4.04C: "resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living." See 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.04C.2. Larson lived alone and testified that he had no limitations placed by any physician on his activities and was able to engage in most activities of daily living. AR 49–55.

## C. Step Four Determination—Residual Functional Capacity Assessment

The ALJ determined that Larson had the RFC to perform light-duty work. AR 15–19. The ALJ evaluated Larson's medical history and then concluded: "Thus, while the medical records support that the claimant has limitations arising from his severe impairments, those

22

limitations do not support a finding that the claimant is precluded from all work activity." AR 18. In reaching this conclusion, the ALJ referred to the non-examining physician's reports. AR 18–19. Larson argues that the ALJ inappropriately relied solely on a non-examining physician's evaluation. Doc. 15 at 37–41. Larson also asserts that the ALJ failed to factor in restrictions resulting from both severe impairments and other impairments not identified at step two. Doc. 15 at 37–41.

The claimant's "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise, 641 F.3d at 923 (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the work place." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "The ALJ determines the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and other, and the claimant's own descriptions of his or her limitations." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

The ALJ in his decision stated that he had carefully considered all of the evidence (AR 15); that in making the RFC finding, he "consider[ed] all of the claimant's impairments, including impairments that are not severe" (AR 11); that in making the RFC finding, he "considered all symptoms and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (AR 15); that he "considered all of the evidence of record . . . whether explicitly discussed in [its] decision or not" (AR 18); and that after he "[c]onsider[ed] the claimants' activities of daily living and previous work activity, the treatment records, the State agency consultant's physical assessment findings, and the subjective complaints and hearing testimony of the claimant, . . . [he determined that] the

23

claimant's limitations [were] not fully disabling, and that the claimant retain[ed] the capacity to perform work activities with the limitations set forth [in the RFC]" (AR 19). When an ALJ, as here, has stated that he considered such matters, a reviewing court cannot assume otherwise. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). Thus, this Court cannot assume that Larson is right in alleging that the ALJ failed to consider Larson's severe impairments and other impairments in reaching the RFC.

Larson invokes Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), to argue that the ALJ inappropriately relied on a non-examining physician—Dr. Whittle in this case—for the assessment of Larson's RFC. Doc. 15 at 40–41. According to the Nevland decision, "opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Id. at 858. Unlike in Nevland, however, the ALJ here did not base Larson' RFC solely on the evaluation of the non-treating, non-examining physician. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming ALJ decision that claimant had RFC to perform substantial gainful activity in the national economy where, in addition to considering consulting physician's opinion, the ALJ considered the medical evidence, statement of the claimant's treating physician, the claimant's description of his daily activities, and the claimant's lack of motivation to return to work). The ALJ appeared to consider, but not adopt Dr. Whittle's evaluation, and indeed the ALJ's determination that Larson could do no climbing or balancing is at odds with Dr. Whittle's opinion. AR 71, 82–100. Of course, there is nothing wrong with an ALJ taking into account a non-treating, non-examining physician's opinion, as long as it is not the sole basis for the RFC determination. Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the non-examining physician] along with the medical evidence as a whole."); Harris v. Barnhart, 356 F.3d 926, 931

24

(8th Cir. 2004) ("[A]n ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment."). The Eighth Circuit does not require an ALJ to link each component of an RFC to a specific medical opinion. See Martise, 641 F.3d at 927.

There is an anomaly with the ALJ's step four and five determinations that, when combined with the addition of Dr. Dickerson's neuropsychological evaluation, prevents this Court from finding substantial evidence on the record as a whole to affirm the ALJ. The ALJ's step four decision that Larson cannot perform any past relevant work (some of which appears to have been light duty) conflicts with his adoption of Dr. Whittle's conclusion that Larson has the RFC to perform light-duty work.[11]  See AR 15, 19. Absent Dr. Dickerson's report, perhaps the ALJ's decision could be affirmed nevertheless based on evidence of Larson's ability to do the mail clerk job, but Dr. Dickerson's report undermines that conclusion.

At this point, this Court must forecast "how the ALJ would have weighed the new evidence had it existed at the initial hearing," on the determination of Larson's RFC. Bergmann, 207 F.3d at 1068. The records of acute pancreatitis likely would have made no difference to the ALJ's determination of Larson's RFC, particularly because those records are

---

[11]The ALJ's decision seems to have an internal contradiction. The ALJ adopted Dr. Whittle's opinion that Larson had the RFC to perform light-duty work. AR 19. ("[T]he undersigned finds that the claimant's limitations are not fully disabling, and that the claimant retains the capacity to perform work activities within the limitations set forth above" and "[t]he undersigned gives great weight to the opinions of Dr. Whittle . . . as they are consistent with the medical evidence as a whole and the residual functional capacity assessment described above."); see AR 89 (Dr. Whittle's report stated that "[n]on-exertional limitations do not significantly erode the occupational base" which was noted as "light work"); 99 (same). Yet, the ALJ later found Larson not to have the ability to perform the full range of light-duty work as set forth by Dr. Whittle's evaluation. AR 20 ("However, the claimant's ability to perform all or substantially all of the requirements of this level of work [meaning light duty] has been impeded by additional limitations.") The ALJ on remand should clarify these matters so as not to leave an apparent inconsistency.

from 2002 and from late 2004 and early 2005, and Larson worked after those hospitalizations and serious health issues. The neuropsychological evaluation from October of 2013, however, would have impacted the ALJ's decision regarding Larson's RFC. How the ALJ would have weighed the neuropsychological evaluation is hard to forecast. Some evidence still would exist to support the RFC and undermine Dr. Dickerson's testing in the form of the Sandbulte evaluation of February of 2012, but her evaluation and testing appears to have been more superficial. Compare AR 398–404, with AR 553–72. Some of Dr. Dickerson's findings regarding deeply impaired verbal learning and cognitive and dexterity issues cast doubt on the RFC of a capability to do a range of light-duty work although Larson had good ability to learn visually and did well on other tests. "Substantial evidence on the record as a whole" requires consideration of both evidence supporting and detracting from the decision. This case is being remanded for reasons set forth below, which will give the ALJ an opportunity to revisit the RFC determination and evaluate directly what, if any, effect Dr. Dickerson's report has on that and to clarify how it is that Larson has the ability to do light-duty work and yet no ability to perform his past light-duty employment.

**D. ALJ's Step Five Findings**

Larson challenges the ALJ's step five decision that Larson has the RFC to work as a mail clerk. Doc. 15 at 41; see AR 20. Larson refers specifically to the opinions of Dr. Dickerson, which postdated the ALJ's decision, to argue that he cannot perform the duties of a mail clerk. Doc. 15 at 41.

At the hearing, vocational expert James Miller was called as a witness by the ALJ. AR 56–62. Miller accepted the state agency assessment of Larson's limitations and initially concluded that Larson could be a sandwich maker and pizza delivery person, which was past

26

work that he had performed, and possibly still be a pizza maker. AR 58–59. Miller initially testified that he saw no reduction in Larson's ability to perform a full range of unskilled light work. AR 59. Miller mentioned "mail clerk" as an example of an unskilled job that Larson could perform where there are jobs available in the region. AR 59–60. However, when presented on cross-examination with physical limitations that Larson testified about, Miller said that it was unlikely that Larson could return to any of his past work, such as a pizza delivery person. AR 61–62.

The ALJ in his decision concluded that Larson was "unable to perform any past relevant work." AR 19. With regard to the ability to do the "full range of unskilled, light work," AR 59, as Miller initially testified Larson could, the ALJ disagreed in reasoning:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.

AR 20. The ALJ relied on Miller's testimony that Larson would be able to perform the requirements of a mail clerk and that there were jobs in the region for that position. AR 20. While Miller's initial testimony held out mail clerk as an illustration of a light-duty job within Larson's capability, the ALJ's decision appears to rely on mail clerk not as an illustration but as the lone job Larson could perform.

Complicating this analysis is the post-hearing and post-decision evaluation done by Dr. Dickerson. At set forth earlier, Dr. Dickerson concluded that his neuropsychological testing revealed that "Mr. Larson could not specifically perform the 209.687.026 Mail Clerk Job." AR 570. Dr. Dickerson found Larson to have both cognitive and dexterity issues that would prevent him from working as a mail clerk. AR 570. When such post-hearing evidence is submitted, this

27

Court is to engage in the "peculiar task" of deciding "how the ALJ would have weighed the new evidence had it existed at the initial hearing." Bergmann, 207 F.3d at 1068 (citation omitted). This is a particularly difficult task under these circumstances.

On the one hand, Dr. Dickerson is not a vocational expert and opining as to who can and cannot do the work of a mail clerk likely is outside of Dr. Dickerson's realm of expertise. See Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004) (noting that the Commissioner can discount a doctor's vocational opinion as being outside of a doctor's area of expertise). Some of Dr. Dickerson's testing revealed Larson to have good cognitive function, although he is an impaired verbal learner. AR 559–63. Dr. Dickerson's opinion that Larson has a form of dementia due to organ failure and encephalopathy from 2002 or 2004 to 2005 is in part undermined by the fact that Larson had substantial gainful activity by being employed after his hospital discharge following the 2004 to 2005 life-threatening bout with acute pancreatitis. Finally, the record contains a report of another psychologist who did not have a similar impression of Larson, AR 397–404, and indeed Larson himself denied having mental health issues other than anxiety in response to questioning from the ALJ, AR 54.

On the other hand, Dr. Dickerson is a neuropsychologist, with a much more extensive background than the psychologist who previously evaluated Larson. Compare AR 553–72, with AR 397–404. The battery of tests that Dr. Dickerson administered was more extensive than the evaluation previously done, and Dr. Dickerson took the time to speak with the adoptive parents of Larson and review his medical records. AR 553–72. While Larson's employment after the acute pancreatitis undermines part of Dr. Dickerson's opinion, Dr. Dickerson had two other diagnoses—panic disorder with agoraphobia and dysthymia—that would remain. The ALJ ultimately determined that Larson could not do the full range of light-duty work and identified in

28

his decision only the job of the mail clerk as one Larson could perform, which is why Dr. Dickerson's conclusion (whether he had the expertise to so conclude or not) that Larson could not perform the duties of a mail clerk so directly undermines the result.

Although it is true that submitting new evidence after an ALJ's decision is disfavored, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Sullins v. Shalala, 25 F.3d 601, 603 (8th Cir. 1994), the appeals council here permitted it and ostensibly reviewed the material. Thus, this Court is to consider it as well and to attempt to plumb the mind of the ALJ as to what the ALJ would have done had the material been in front of him, mindful of the "substantial evidence in the record as a whole standard." Bergmann, 207 F.3d at 1068. The ALJ's decision would not have been the same in light of Dr. Dickerson's opinion,[12] and, indeed, the ALJ's questions to the vocational expert likely would have been significantly different. Here, with the more direct evidence being that Larson has cognitive and dexterity issues preventing him from performing the one job identified specifically by the ALJ as within his limitations, this Court cannot find the "substantial evidence in the record as a whole" standard to be met.

## IV. Conclusion

Larson requests reversal and remand of the Commissioner's decision with instructions to award benefits, or in the alternative reversal and remand with instructions to further consider his case. Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g); see also Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). Sentence four of Section 405(g) permits a district court to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

---

[12]This Court for reasons explained in this Opinion and Order cannot accurately forecast whether the ALJ would have found Larson to be disabled and, if so, what the possible onset date might have been.

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand with instruction to award benefits is appropriate "only if the record overwhelming supports such a finding." Buckner, 213 F.3d at 1011 (internal quotation marks and quotation omitted). Here, reversal and remand is warranted not because the evidence of Larson's disability is overwhelming, but because Dr. Dickerson's findings directly undercuts the ALJ's reasoning and the ALJ in fairness ought to reevaluate the decision as to Larson's RFC and ability to work at a job where significant numbers exist in the national economy. For the reasons explained above, however, this record falls short of justifying blind acceptance of Dr. Dickerson's findings and a conclusion of entitlement to benefits. Accordingly, "out of an abundant deference to the ALJ," remand under Sentence four of Section 405(g) for further administrative proceedings is the appropriate course here. Id. (internal quotation marks and quotation omitted).

For the reasons stated above, it is hereby

ORDERED that the decision of the Commissioner is reversed and this action is remanded to the Social Security Administration for the purpose of reevaluation, consistent with this Opinion and Order.

DATED this 1st day of ~~February~~ March, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

30